FILED
2014 FEB 14 A 9:22
CLERK
U.S. BANKRUPTCY
COURT - ERIE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| JOSEPH SAUL HENTON,  *Debtor* | : : : | Case No. 13-10216-TPA  Chapter 7 |
| DENG DENG,  *Plaintiff* | : : : | Adversary No. 13-1040-TPA |
| v. | : : | Related to Doc. No. 1 |
| JOSEPH SAUL HENTON,  *Defendant* | : : | |

*Appearances:*  Paul Bercik, Esq. for the Plaintiff
Arthur Martinucci, Esq. and
Michael Kruszewski, Esq. for the Defendant

# MEMORANDUM OPINION

The Plaintiff, Deng Deng ("Deng") filed this Adversary Proceeding seeking to have his claim against the Debtor, Joseph Henton ("Henton") found to be non-dischargeable as arising from a willful and malicious injury. The claim relates to injuries sustained by Deng as a result of being stabbed or cut with a pocket knife by Henton during an incident that occurred outside Tortuga's Bar in Bradford, Pennsylvania in the early morning hours of October 7, 2011. Henton admits the stabbing occurred but argues that Deng initiated the attack and he (Henton) responded

with a proper exercise of self-defense. The relevant statute provides:

> § 523. Exceptions to discharge
>
> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
> ...
>> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

*11 U.S.C. §523(a)(6)*. After a trial conducted on January 14, 2013, and for the reasons stated below, the Court finds in favor of Henton and denies the requested relief.[1]

## *PROCEDURAL BACKGROUND*

The case commenced on May 15, 2013, when Deng filed his Complaint. Thereafter the case experienced an active pre-trial procedural history. Most particularly, Henton filed a *Motion for Summary Judgment* ("Motion") on October 22, 2013, which, while denied, nonetheless resulted in a legal ruling that established the parameters for the subsequent trial. *See, Order* of December 10, 2013, Document No. 30. In that Order, the Court found that "willful" and "malicious" are separate elements under *Section 523(a)(6)*, both of which must be present to establish the non-dischargeability of a debt. The Court found that by Henton claiming self-defense he admitted to intentionally stabbing Deng, which was sufficient to establish the willful element, at least for purposes of the *Motion*.

---

[1] The case is a core matter under *28 U.S.C. §157(b)(2)(I)* and the Court has jurisdiction over the matter pursuant to *28 U.S.C. §1334*. Neither Party has ever raised an issue regarding jurisdiction or core status. This Memorandum Opinion represents the Court's findings of fact and conclusions of law under *Fed.R.Bankr.P. 7052*.

2

The treatment of the "malicious" element was somewhat more complex. The Court found the stabbing to be presumptively malicious, but found further that if Henton's contention of self-defense was established, that could furnish a just cause or excuse that would overcome the presumption. The Court further found that, since the stabbing by Henton involved the use of a deadly weapon, for self-defense to be recognized it had to be shown that:

- Henton was free from fault in provoking or continuing the difficulty that resulted in the use of the deadly force.

- Henton reasonably believed he was in imminent danger of death or serious bodily injury and there was a necessity to use such force in order to save himself; and,

- Henton did not violate any duty to retreat or avoid the danger.

*Order* of December 10, 2013, at 3 (citing *Commonwealth v. Harris*, 665 A.2d 1172 (1995), *18 Pa. C.S.A. §505(b)(2)*, and *In re Greene*, 397 B.R. 688 (S.D.N.Y. 2008) ). The Court found unresolved questions at least as to the first two of these "elements," and for that reason denied the *Motion*.

In addition to the Order denying the *Motion*, the subsequent trial was also shaped by the Pretrial Order issued the same day at Doc. No. 31 in which the Court held that self-defense in the context of this case is an affirmative defense on which Henton bears the burden of proof. Henton was given an opportunity to file a motion *in limine* if he objected to that conclusion, but he did not do so. The Court reiterated this ruling at the start of trial, stating that Henton would bear the burden

of proof on self-defense by a preponderance of the evidence[2] to which neither party objected. As a result of this ruling on the burden of proof, Henton was directed to proceed first with his case at trial even though he is the defendant. After Henton presented his case, the Court found that he had made out a prima facie case of self-defense, shifting the burden of going forward back to Deng.

## *FACTS*

The two Parties themselves were the only two witnesses presented at the trial.[3] The only Exhibits that were introduced into evidence were by Deng, and they consisted of some post-

---

[2] The Court is, of course, well aware that as a general rule statutory exceptions to discharge are construed narrowly against the creditor and in favor of the debtor, with the creditor having the burden of establishing that a debt is nondischargeable by a preponderance of the evidence. *See, e.g., In re Mehta*, 310 F.3d 308, 311 (3d Cir. 2002); *Corso v. Walker*, 449 B.R. 838, 845 (Bankr. W.D. Pa. 2011). By holding as it did on the *Motion*, reiterated at the start of trial, the Court was essentially saying that Deng had prima facie met his burden of showing that the *Section 523(a)(6)* exception to discharge applies and that Henton now bears the burden of establishing that he acted in self-defense, which is in the nature of an affirmative defense, or an exception to an exception to discharge. *C.F., In re Burton*, 117 B.R. 167, 169 (Bankr. W.D. Pa. 1990) (referring to "undue hardship" as in the nature of an affirmative defense or an exception to an exception), *In re Taylor*, 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004) (claim of self-defense in a *Section 523(a)(6)* action is an affirmative defense on which debtor bears burden of proof).

[3] The Court notes that there were a number of other people who were present at the time of the incident who may have been able to provide helpful testimony, but none of them were called as witnesses at the trial. These other people included both friends of Deng and friends of Henton. Since any inference to be drawn from a failure to call would thus cut both ways equally, the Court views the failure to call any of these people as a non-factor in its decision. It might also be pointed out that some of these other individuals did testify under oath at a preliminary hearing in a criminal matter arising from the same incident, and the transcript of that hearing was listed as a potential exhibit by Henton in his Pre-Trial Statement. However, neither side referenced or attempted to introduce the transcript as an exhibit at trial under *Fed.R.Evid. 804(b)(1)*, either as a whole or in part. After the close of evidence the Court inquired of the Parties as to what exhibits should be made part of the record. Henton's attorney initially mentioned the transcript but when the Court noted that it had never been used at trial and questioned why it would be an exhibit, he agreed, withdrew his request and made no further effort along that line. Deng's attorney never even made a suggestion that the transcript should be part of the record. Therefore, in reaching its decision the Court has not considered any of the testimony from the criminal case transcript. Finally, both Parties expressed the view that the outcome of the criminal matters arising from this same incident is irrelevant to the present case to which the Court agrees.

surgery photographs showing the site of his wound, medical records from the Bradford Regional Medical Center where he was treated, photographs of the clothes he was wearing at the time of the incident and a hand-drawn diagram of the scene that was prepared at the preliminary hearing in the criminal matter.

The testimony of the two Parties agreed in broad, general outline as to the events of the night in question, though there were fundamental disagreements on some key points. The Court was, in general, favorably impressed with the credibility of both witnesses and did not detect what it considered to be any deliberate falsehoods by either one. The Court attributes any differences in testimony mainly to the differing perspectives and points of view of the Parties in what was undoubtedly an adrenaline-filled atmosphere. The Court will briefly set forth the basic facts upon which both sides seem to agree, saving any closer examination of disputed points for the legal analysis which follows.

As noted, the incident in question occurred at a bar on Main Street in Bradford named Tortuga's on October 6-7, 2011. Henton, who was in his early 30s at the time, arrived at Tortuga's around 10:00 P.M. along with two friends, Joseph Leo and Kurt Cummings. Henton acknowledges having consumed "a couple of beers" while he was there, but there is no evidence he was intoxicated. Deng arrived at Tortuga's a little later, also with two friends, Esteban Santiago and Ahmed.[4] Deng was a college student at Pitt-Bradford and was not of legal drinking age at the time. He was going to Tortuga's to attend a DJ dance event held in a room on the second floor of the building that was geared toward under-age persons and which did not feature the sale of alcohol.

---

[4] The last name of Ahmed was never provided at trial.

There is no evidence that Deng consumed any alcohol. The two Parties did not know each other prior to the incident to be described. For reasons that will become apparent, it is also of relevance that Henton is Caucasian and Deng is African American.

The upper room at Tortuga's was dimly lit, music was playing and people were dancing. There was a crowd of perhaps 20 to 25 individuals in the room. Many of these people were Pitt-Bradford students. At some point during the evening, after Deng had already arrived, Henton and his two friends went from the first floor up to the second floor and spent a short time there. One of Henton's friends, Joseph Leo, took a cell phone picture of some young women who were dancing. These women were also students at Pitt-Bradford. There apparently was some discussion at that time to the effect that the action of taking the picture was not appreciated. No altercation or serious argument occurred at that time, however, and neither Deng nor Henton was directly involved. Henton and his group eventually returned to the first floor.

At around 1:00 A.M., Henton's group left Tortuga's. A large group of people who had been upstairs, including Deng, were congregating around the outside area near the front door of the bar. The women whose picture had been taken started complaining about that incident. Some of their male companions got involved and asked that the picture be deleted. Leo agreed to delete the picture. Neither Henton nor Deng were involved at all in any of that activity and there was no interaction between the two Parties at that time. As Henton's group began leaving the scene, there was some banter and insults continuing between members of the two groups.

As Henton's group approached Kennedy Street, an intersecting street approximately 20 yards from Tortuga's, while still on the same side of Main Street, Deng suddenly removed the

"hoody" he was wearing and began running toward them. He caught up with Henton and threw a punch at him. Henton went across to the other side of Main Street, pursued by Deng who caught up to him and then threw more punches. At some point during this event Henton fell to the ground and, while laying on his back covering his head with one arm to protect against being hit in the head, reached into his pocket with his other hand and pulled out a Swiss-army type pocket knife. He opened it up and began swinging it as he flailed about, resulting in a stab wound to the Plaintiff in the left side of his abdomen. Henton then ran from the scene.

Deng did not immediately realize he had been stabbed. He discovered the injury on his way back toward Tortuga's and sought treatment at the Bradford Regional Medical Center. According to the medical records that were introduced at trial, he spent a week in the hospital during which time he underwent a surgery to repair the stab wound to his abdomen.

## *DISCUSSION*

As indicated above, the Court previously ruled that the injury inflicted upon Deng by Henton was "willful" under *Section 523(a)(6)*, at least for purposes of the *Motion*. Having now heard the evidence presented at trial, the Court reaches that same conclusion for purposes of its final judgment. To constitute a willful injury, the actor must have either "purposefully inflicted the injury or acted with substantial certainty that injury would result." *Conte v. Gautam (In re Conte)*, 33 F.3d 303, 305 (3d Cir.1994). By claiming self-defense, Henton necessarily admits to having intentionally stabbed Deng in order to protect himself. *See, e.g., Harris*, 665 A.2d at 1175. Furthermore, as noted in the ruling on the *Motion*, the only readily apparent reason for intentionally

7

stabbing someone would be to inflict an injury on the person, and an injury would be the natural and likely outcome of a stabbing.

Even if Henton had not specifically raised a claim of self-defense, the evidence at trial was sufficient to establish willfulness. On cross-examination Henton acknowledged having intentionally removed the knife from his pocket, intentionally opened it, and intentionally swung it in the direction of the person or persons attacking him. He also acknowledged knowing that inserting a knife into someone would harm them. Henton may not have deliberately intended to inflict an injury, in the sense that his fundamental purpose was simply to stop the attack and he would have been just as satisfied if the result of his actions was to cause Deng to retreat without him also being cut by the knife. However, the Court does not believe a deliberate intent to injure is required to meet the willfulness element. An act done intentionally which is substantially certain to produce harm constitutes a willfully inflicted injury. *Conte*, 33 F.3d at 308-09. Wildly swinging a knife while knowing another person to be in close proximity to oneself is substantially certain to produce harm and that is all that is required.

That leaves the maliciousness element to be determined by the Court, which involves an analysis as to whether Henton has sufficiently established his claim of self-defense, i.e., the three *Harris* elements. Having heard the evidence at trial, and consistent with its ruling on the *Motion*, the Court has no trouble concluding that the third element has been met because Henton did not violate any duty to retreat or avoid danger. The evidence was clear that Henton attempted to "retreat" by running away at the first sign that Deng intended to come after him and then again after he was punched for the first time. The first and second elements require a more thorough discussion.

### *Provocation*

For the affirmative defense of self-defense to apply, Henton must have been free from fault in provoking or continuing the difficulty that resulted in the use of the deadly force. Based on Henton's testimony, the Court found at trial that he had met his burden of proof as to this issue.

Henton credibly testified that he did not even notice Deng on the night of the incident, either inside the bar or among the crowd outside, until Deng and others began running after him. Henton testified that he never spoke to Deng at all. In response to a direct question from Deng's Counsel, Henton denied ever calling Deng the "N-word." Henton testified that, rather than being someone who was egging on or encouraging any animosity between his group and the others outside Tortuga's, he was actually attempting to get his two friends to leave the scene more quickly when the attack occurred. He acknowledged there was bantering and insults going on back and forth between his friends and the crowd outside the bar immediately preceding the incident, but said he was not involved. Nor did the testimony of Deng involve Henton in the early stages of the event. Thus, based on Henton's testimony, the attack by Deng was completely unprovoked, at least not by Henton himself, making him free from fault.

When Deng testified, he agreed that Henton never physically or verbally threatened him harm in any manner on the night in question. Therefore, it is clear that Henton did not provoke Deng's assault on him in that respect. However, Deng's testimony included an account that differed from Henton's on points that could be relevant on the issue of a possible verbal provocation based on non-threatening, but highly offensive words.

Deng testified that he did recall seeing Henton and his friends in the upstairs room at Tortuga's. While he had no direct exchange with the group at that time, he said he was about 10 or 15 feet away from them and the group was "mumbling and laughing" while looking toward him in a manner which led him to believe they were talking about him in an insulting way. This annoyed him but he did not confront or challenge them in any way – instead, he attempted to ignore them. Eventually, Henton and his friends returned to the downstairs of the bar.

Deng testified that he did not see Henton again inside Tortuga's. Eventually he left the bar with his two friends and was waiting with them outside the entrance for another friend who had asked them for a ride back to school, and who was in the process of finishing a drink inside. There were about a dozen people outside the bar at that time. While thus waiting, Deng noticed Henton and his friends as they were walking away from the bar, perhaps 20 yards away. He was also aware of the dispute about the cell phone picture, but he was not involved in that matter at all. Deng testified that words were going back and forth between Henton's group and the crowd, though he himself did not say anything. At some point, he allegedly heard Henton yell something like "go home N - - - - -," which he took to be aimed at him.[5] Deng speculated that Henton may have done so out of a mistaken belief that he (Deng) was involved in the ongoing verbal back-and-forth between the groups. Hearing that epithet, coupled with what had occurred upstairs earlier, Deng became enraged, whereupon he pulled off his jacket and began running after Henton, setting off the chain of events that ultimately led to the stabbing.

---

[5] Based on the evidence presented, it appears that Deng and Ahmed were the only two African American individuals at the scene.

If Deng's version of events is assumed to be true, Henton might be found to have been at fault in provoking the "difficulty" which ultimately led to Deng's stab wound. Although in general "mere words" are insufficient to constitute a provocation, that is not always the case. In certain instances words may be so offensive or incendiary that their very utterance is likely to trigger a violent reaction, and thus, such utterance can rightly be viewed as a provocation. *See, e.g., Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) (discussion of "fighting words" as those which by their very utterance inflict injury or tend to incite an immediate breach of the peace).

In the Court's view, given the unfortunate history of the word's use, when a Caucasian person refers to an African American by using the "N" word in a belligerent manner, that could well be an exception to the general rule that words alone cannot be a provocation. There are a number of cases that support this view. For instance, in *In re Spivey*, 480 S.E. 2d 693 (N.C. 1997), a district attorney was removed from office following an incident at a bar in which he repeatedly called out to an African American using the "N word." In discussing such conduct, the court stated:

> At the hearing on this matter, there was testimony concerning the hurt and anger caused African–Americans when they are subjected to racial slurs by white people. We question, however, whether such testimony was necessary to the findings of the superior court in this case. Rule 201(b) of the North Carolina Rules of Evidence provides that a trial court may take judicial notice of a fact if it is not subject to reasonable dispute in that it is generally known within the territorial jurisdiction of the trial court. N.C.G.S. § 8C–1, Rule 201(b) (1992). *No fact is more generally known than that a white man who calls a black man a "nigger" within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate.*

480 S.E. 2d at 698-99 (emphasis added). For similar reasoning, *see, e.g., Downs v. State*, 351 A.2d 166 (Md. Ct. Spec. App. 1976), *Walker v. Bluff City Buick Co., Inc.*, No. 98-2009 1998 WL 957333,

W.D. Tenn. Dec. 13, 1998) *In re J.K.P.*, 296 P.3d 1140 (Kan. Ct. App. 2013), *In re H.K.*, 778 N.W.2d 764 (N.D. 2010), *In re John M.*, 36 P.3d 772 (Ariz. Ct. App. 2001).

Were the Court to conclude that the evidence supported Deng's contention that Henton yelled to him "N - - - - - go home," or something similar, it might thus find that Henton was at fault for having provoked the attack by Deng, leaving Henton unable to show the first *Harris* element and thus unable to establish a self-defense claim. However, after careful consideration of the testimony, the Court does not find sufficient evidence to support that contention.

Deng acknowledges that he never saw Henton actually speak the offensive statement. Deng was looking toward the bar and only heard the yell – he never saw who made it. In other words, the sole basis for Deng's conclusion that Henton had yelled the slur at him was the sound of the voice he heard. For that conclusion to carry any credibility with the Court, Deng would have to show that he had some experience under similar circumstances connecting the voice with the alleged speaker. *See, e.g., Fed.R.Evid. 901(b)(5)*. This is where Deng's evidence falters.

It is undisputed that the two Parties did not know each other prior to the night of the incident, so Deng would have had no familiarity with Henton's voice other than what he may have gained on that night. Deng's testimony concerning the events that occurred in the upstairs room of the bar was not sufficient to provide any familiarity. At best, Deng heard some "mumbling and laughing" from a group of people located about 10 or 15 feet away from him in a loud, dim, crowded room, some of which may have come from Henton. Deng only referred to "mumbling" from the Henton's group, he did not specifically testify that Henton had been a speaker. Nor did the brief period of time between Deng's exit from the bar and when the yelling occurred provide a credible

opportunity for him to gain a familiarity with the character or quality of Henton's voice. Deng testified that he did not see Henton's group when he went outside and was not paying attention to whatever may have been going on concerning the photograph. When asked on cross-examination as to how he knew that Henton had been the one to yell the offensive phrase when he had been looking in another direction toward the bar at the time, Deng answered "they were the only two – the only three people that were there basically yelling back at the crowd." *See Audio Transcript of Proceeding* dated Jan. 14, 2014 at 10:56:08 et seq.

The Court finds that the evidence presented by Deng is insufficient to overcome Henton's credible denial that he never yelled anything at Deng. Deng had negligible familiarity at best with the voices of either Henton or his two friends. Even assuming that someone did yell the offensive statement at Deng, it could just as easily have been Leo or Cummings who had done so. If anything, in light of the circumstances surrounding the event as testified to by both Henton and Deng, they would seem to be more likely candidates given that they had been the ones more directly involved in the photograph incident that seems to have precipitated the atmosphere of hostility arising at the scene of the events. Thus, the Court finds that Henton did not provoke the difficulty that led to him using a knife, so that element of *Harris* is met.

### *Reasonable Belief of Death or Imminent Bodily Injury*

The final factor to consider is whether Henton had a reasonable belief that he might be killed or sustain serious bodily injury at the time he employed the knife. The relevant testimony on this point by the Parties differed significantly.

13

As described by Henton, a group of about eight people from the crowd, led by Deng, began running toward him and his friends, causing him to turn and start running. He said several of the people caught up to him within a few steps and began throwing punches at him. He escaped that brief engagement without fighting back and started running to the opposite side of Main Street trying to get away, but just as he got there, they caught up to him again. He was hit in the head by someone and went to the ground and onto his back. At least "four people," including Deng and Santiago, then began kicking and punching him on his back, ribs, chest and head. (Henton testified that he could not identify any of the other individuals). Henton said he had his left arm draped over his head and his legs tucked in and lifted up in the air. He said the attack continued until a point where he received a blow in the head that caused him to think he would pass out. Fearing death, he then reached into his pocket for the knife while yelling that he had a knife. Upon retrieving and opening the knife, Henton began blindly slashing with it through the air with his right hand while keeping his left arm and hand over his head. The attack continued for several seconds longer, he heard someone say "he has a knife," and the attack ceased at that time. Not yet knowing that he had actually stabbed anyone, Henton then rolled over, got up on his feet and ran away.

As Deng describes it, the encounter he had with Henton was essentially a one-on-one affair. After he heard the racial slur, Deng took off his sweatshirt and began running after Henton intending to fight, accompanied only by Santiago, who had also removed his sweatshirt. No one else from the crowd made any move to go with them except Ahmed, who started to give chase but then stopped at Kennedy Street. Deng first met up with Henton just across Kennedy Street and hit him once, causing Henton to stumble. Henton then hit him back, and the pair stumbled across Main

Street, where Deng hit Henton two or three more times. While Deng was hitting Henton, Henton slashed at him and apparently made contact, though Deng felt it as a weak punch and did not immediately realize that he had been cut. According to Deng, Santiago never struck Henton, but instead only "had my back" to ensure that Leo or Cummings did not try to get involved in the fight. Deng said it was Santiago who ultimately pulled him away from Henton, ending the fight.

As can be seen, to put it mildly, the Parties are rather far apart in their descriptions of the relevant events. In reconciling the conflicting testimony it would have been helpful to have heard from someone else who was at the scene, but unfortunately that was not provided. The Curt must do the best it can with the evidence presented.

Before considering the evidence, a brief review of the applicable law on what constitutes a reasonable belief of death or serious bodily injury is necessary. In *Commonwealth v. Mouzon*, 53 A.3d 738, 752 (Pa. 2012) the Court stated:

> The requirement of a reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant "must have acted out of an honest, bona fide belief that he was in imminent danger," which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

The court in *Mouzon* also noted that it is a mistake to focus only on the moment in time when the allegedly self-defensive conduct occurred because "these situations routinely involve developing factual patterns that must be considered in their totality." *Mouzon*, 53 A. 3d at 752.

15

With respect to the subjective component, the Court has previously indicated that it found Henton to be generally credible. This includes his testimony that he was scared and feared that he might die as a result of the attack. The Court thus concludes that Henton did have an honest belief that he was in imminent danger at the time he pulled out and used his knife. The question then becomes whether that belief was reasonable in light of the facts as they appeared to him.

Viewing the circumstances in their totality, Henton was faced with a potentially hostile crowd that clearly outnumbered the group he was with and that was being urged to get aggressive over the photograph incident. It is undisputed that at least two individuals stripped off their sweatshirts and began running toward him, a sure sign of an intent to fight. Deng initiated the physical confrontation by hitting Henton. Even though Henton managed to escape this initial attack, he was pursued and subjected to a second attack. There was obviously a strong disagreement as to whether this second attack involved just Deng, as Deng contends, or Deng and several other individuals, as Henton contends. In trying to determine what really happened, the Court finds it highly significant that Deng was not the only one cut by Henton. Deng acknowledged that Santiago was cut as well, though apparently his wound was not as serious. This suggests to the Court that Santiago was involved in the second attack on Henton as well, or at least was positioned close enough to the "action" so that Henton could have reasonably perceived him to be involved. This account seems more likely to the Court than the alternative explanation put forward by Deng to the effect that Santiago was just acting as a protective bystander who was standing away at a distance and then just happened to get cut while he moved closer in an attempt to break up the fight.

Thus, objectively speaking, Henton was faced with a multi-person attack on his person that by his testimony included blows from punches and kicks to his ribs and head while he was in essentially a helpless position on his back, attempting to cover his head with one hand and curled into a ball. Henton testified that he suffered a concussion and had "tread marks" on his face and head after the incident from kicks he had received. The Court finds that it would be objectively reasonable to fear death or serious bodily injury if such a vital area of the body as the head is subjected to such trauma. Even if those injuries were not inflicted by Deng, they were part of the totality of the circumstances faced by Henton.

The Court also credits Henton's testimony that he verbally announced that he had a knife as he was pulling it out of his pocket. Such testimony indicates that Henton's dominant purpose in bringing out the knife was to halt the attack, possibly by "scaring off" his attackers, not to inflict any injury *per se*. This too seems more consistent with a person acting in self-defense out of a fear of death or serious bodily harm than someone just upping the ante in a mutually consented to fight. The fact that the attack continued for some moments even after the knife was brought to bear tends to show that it was objectively reasonable for Henton to believe that he needed to act to avoid death or serious injury.

The Court finds that the element of a reasonable belief of death or serious bodily injury has been established. All of the required elements to show a claim of self-defense having been met, and based on the Court's prior ruling on the *Motion*, it therefore finds that sufficient justification for the stab wound injury to Deng has been shown to negate any maliciousness on the part of Henton in inflicting the injury.

## CONCLUSION

This has been a most difficult case to decide but under the evidence presented the Court concludes that the injury which Henton inflicted on Deng, while willful, was not malicious. Deng's claim is therefore not excepted from discharge pursuant to *11 U.S.C. §523(a)(6)*. An appropriate order follows.

Dated: February 13, 2014

_____
Thomas P. Agresti, Judge
United States Bankruptcy Court

Case administrator to serve:
    Debtor
    Arthur Martinucci, Esq.
    Michael Kruszewski, Esq.
    Paul William Bercik, Esq.                                    :